We'll turn now to our first argument of the day, which is Cohen v. Cohen, number 21-2997, and we'll start with you, Mr. Fogdell. Good morning, Your Honors. May it please the Court, Stephen Fogdell IV, as amicus for Ronald Cohen. Your Honors, the District Court abused its discretion by not conducting a Daubert analysis on the record and making these specific findings that this Court has said are required under that analysis. And I want to be clear, the error that I'm arguing is not that the District Court failed to hold a Daubert hearing. It is the failure to make specific findings that this Court has said is required under Daubert. That failure is sufficient to warrant a vacator of the judgment and a remand. What specific findings did the District Court not make? Well, start with whether repressed memory is generally accepted in the relevant scientific community. Mr. Cohen, in his Daubert motion, specifically argued that it was not. So the District Court did not make a finding that it was or was not. In fact, if you look at Appendix page 34, what the District Court said is, again, this is Appendix page 34, what the District Court said is that Mr. Cohen's memory expert, Dr. Strange, could say that recovered memory is not well accepted in the literature. And Dr. Hopper, Ms. Cohen's memory expert, could say that it is well accepted in the literature. And then the District Court added, assuming that he cited to something there. So there needs to be a finding as to whether or not repressed memory theory cannot both be well accepted and not well accepted. There's got to be a finding about whether it is or isn't well accepted or the extent to which it is accepted. Why isn't that implicit in the District Court's determination to allow them to testify as experts? And when we have cases like Mitchell, on the one hand, where there's not specific findings that have been made, where do you point us for this absolute requirement that there be explicit findings on the record? Well, Paoli 1 said there must be a developed record and specific findings on reliability issues. And you can reconcile that with Mitchell. And I agree there's some tension between Mitchell and Paoli 1, but Paoli 1 is explicit on that point. And in Mitchell, the argument was not that the case needed to be remanded for further development of the record and findings. The argument was simply that a de novo standard of review ought to apply. That's all the appellant was arguing for on that point, was a different standard of review. And of course, this Court said, no, it's abuse of discretion, notwithstanding that there were no explicit findings. But the way I reconcile Mitchell with Paoli 1 is that in Mitchell, this Court felt that the record was fulsome enough that it could do an evaluation of whether fingerprint testimony was admissible without having to do the remand. But here, the record is just not developed on any of the points. I mean, Mr. Cohen specifically argued that repressed memory was not well accepted in the literature, and there's no finding on that. He argued that there's no evidence that recovered memories are accurate. He argued that in his Daubert motion. There's no finding on that point. He even argued the fit, arguably, although it's not as explicit as one would like, he even argued the fit requirement in the Daubert motion. And there's no finding that the testimony by Dr. Harper... These are all the factors that the rule lays out. So what are you asking for as a remedy, assuming we agree that there is a problem? So in a situation like this, where there are no findings made by the district court, this court has a choice. It can try to make the findings itself. And I've argued in the briefs that if the court does that, then the outcome has to be that Dr. Harper was erroneously admitted. But the better alternative, I am suggesting, is that the district court should make the findings in the first instance. So the court should remand to the district court with instructions to make the findings. Now, I'm also arguing, as part of the remedy for the error, that there should be a Daubert hearing now. There are fundamental disputes between Dr. Strange on the one hand and Dr. Harper on the other hand. And those disputes, the district court needs to make findings as to those disputes. And it shouldn't try to do that on a cold record. It should have a Daubert hearing now, hear from the experts. How do you see that working? I mean, that's a rather novel procedure. It's certainly not one that's contemplated, but it's certainly not expressed in the rule. I understand courts, including this, have sometimes allowed it. But how is it that we're doing that? Are we considering the trial testimony that came in? The suggestion would be that there would be post-trial testimony from the two experts. And that's happened in the... But you can't consider what happened at the trial, right? What's that? You can't, the district court can't consider what happened at the trial, right? I agree. It would be to bring the experts in to have, essentially, inlaminate testimony post-trial, essentially. And that's happened in other cases. There are district courts that have done post-trial Daubert motions. I can give you a site for one if you'd like it. It is rare. Are you suggesting that's required? That in every Daubert case, you have to have live testimony? No, I'm not. No, my argument is not that it was required and it didn't happen, and therefore, it must be remanded. That's not my argument. My argument is findings are required. Findings didn't happen. What I'm saying is, there should be a remand. And given that there should be a remand, in order to make the required findings now, the district court should have a Daubert hearing now. It's not prohibited by the rule, and it would aid in the fact finding that I am arguing must occur. So, I'm not saying that Daubert hearings are mandatory. This Court has said very clearly that Daubert hearings are not mandatory. It's not, was not, the abuse of discretion was not failing to have the hearing. It was failing to make the findings. And now, there should be a Daubert hearing in order to make the required findings. That's my argument. You sent it back for a Daubert hearing when there was no Daubert hearing requested in the first instance. Well, this Court has ordered Daubert hearings in other instances where they weren't requested. So, it's not necessary, it's not necessary to ask for the hearing in the first instance, in order for this Court to grant the hearing as part of the remedy. So, I'm not suggesting that, if my argument was there should have been a Daubert hearing, then I agree, that argument would not have been preserved. That's not my argument. My argument is there must be findings. And given that there must be findings, there should be a Daubert hearing now as part of the remedy for the error. So, I don't think the preservation, I don't think, in order for this Court to grant that remedy, I don't think the request has to be made. So, if we were to remand for a Daubert hearing, all that would be added, essentially, to the record would be the live testimony of the experts, right? There wasn't deposition testimony that was taken of the experts. There was not. There was already briefing. There was indeed. But, if the Daubert hearing would just be the live testimony of the experts, that's already in the trial record, then why don't we have in front of us everything that we would need to make the assessment you're saying that the District Court didn't make? So, let me, so here's one fundamental dispute between Dr. Strange and Dr. Hopper that I think you can't resolve by looking at the trial testimony. So, on the one hand, Dr. Strange says, you can't have a fuzzy image memory that, over time, develops into a full-blown memory that you believe is accurate. Memory does not work like that. She's explicitly said that's not how memory works in her report. Dr. Hopper said exactly the opposite. You can have a memory that comes back in successive fragments over time. And he says, that is how memory works. So, one expert is saying that's not how memory works. The other expert is saying that it is how memory works. That is something that the District Court needs to analyze in the first instance and make a finding on. The jury, a lay jury, should not be hearing two diametrically opposed opinions unless there's been a Dalbert assessment of whether both of those opinions, notwithstanding that they're fundamentally opposed, both of those opinions somehow have scientific grounding. If the District Court has made that determination, but both have good grounds, or sort of have good grounds, then a lay jury can be put in the confusing spot of hearing two experts say opposite things and somehow making a decision. Right, but it's permissible to have experts give diametrically opposite opinions as long as they have a good basis for doing so. Correct. And why can't we make that determination on the record that's in front of us? Well, if you're going to do that, if you're going to do that, I think the determination has to be that the record does not support the admissibility of Dr. Hopper's testimony. So, yes, it is within this Court's purview to say, no, we're not going to remand. We're going to apply the Dalbert factors and make a decision. I think if you do that, the outcome has to be that Dr. Hopper has not been shown to satisfy Dalbert. And the result would be vacater, remand. And then under UGI, I think Ms. Cohen would have to have an opportunity to find another expert. And then we'd be back in the boat of more Dalbert proceedings. So either way, I don't think you can avoid having further Dalbert proceedings in the district court. It can either be what I'm proposing, which could potentially uphold the judgment in the end if the district court finds that Dr. Hopper was properly admitted. On the other hand, there'd have to just be a remand for a new trial. And before that new trial, Ms. Cohen would have to have a chance to identify another expert. And there'd be a scrutiny of that expert. I guess it's a lot to suggest that we could somehow still trust the jury's verdict with a post-trial hearing. The cases that have allowed this have typically been when experts have been excluded. And the courts have said, well, go back, do the Dalbert analysis. If it turns out that they should have been excluded anyway, well, then the judgment stands. Sure. How do we ever know how this trial would have come out since the testimony came in? In other words, I don't, I'm not sure why you're asking for simply a remand for a Dalbert hearing as opposed to saying it should be vacated and you start again. Well, Your Honor, I mean, I did make that argument in the brief. I mean, I did argue per this court's order when I was appointed to address whether Dr. Hopper's testimony was admissible. And as I argued in the briefs, I don't believe it was on the current record. So yes, I mean, I certainly would not be opposed if this court said, we'll decide the Dalbert issue. We'll find that Dr. Hopper was not properly admitted. We'll vacate and remand for a new trial. I would not be opposed to that outcome. I don't know that that's the best outcome here. This is an important issue. And I think the better process for this circuit to deal with this very novel issue. I mean, there has not been, that I could find, there has not been another case where testimony, in this circuit or anywhere in federal court, where this type of testimony has been evaluated under Dalbert. And I think the best outcome for the circuit is to remand so that there can be a thorough analysis of the opinions that Dr. Hopper offered. I mean, this idea that there's. So what about Strange? Do we send it back? Is Strange subject to the same scrutiny? Well, I mean, if Ms. Cohen had moved to exclude Dr. Strange's testimony on the basis that her opinions about memory don't satisfy Dalbert, then absolutely she would have to be subject to Dalbert's scrutiny on that point. Ms. Cohen didn't make that argument. Ms. Cohen did not challenge the core opinions that Dr. Strange offered in a depth. So as the way things currently stand, no. Now, if there was a remand, in the procedure that I'm arguing for, in which there'd be a post-trial Dalbert hearing, could Ms. Cohen at that point make the Dalbert challenge to Dr. Strange? I don't know the answer to that question. If there was a new trial, if the court did what Judge Maney is suggesting and simply vacated, remand for a new trial, at that point I think Ms. Cohen could raise a Dalbert challenge to Dr. Strange, I think. I haven't specifically looked at the issue. I hope I'm answering your question. But you've argued as to statute of limitations that if it went back in that posture, that it would be a completely clean slate and all kinds of arguments and defenses could then be raised. I think, yes, Your Honor. I mean, that's my understanding of the law, that if there was a new trial, there would be a new opportunity for those types of threshold issues to be raised, and presumably that would include an opportunity for Ms. Cohen to raise a Dalbert challenge to Dr. Strange's testimony. I agree with that. Yes, Your Honor. You have raised challenges on all three prongs of Dalbert. Yes. And I'd like to understand better as to both qualifications and reliability. You're challenging those as to the opinion that he's offered. A moment ago, I think you used opinions plural. And it seems to me both qualifications and reliability have to attach to the particular opinions that are at issue. Yes. Can you identify for us which particular opinions you're asserting that Dr. Hopper was not qualified to give? Yes. And the particular opinions that you're saying didn't have a good basis in science? Yes. So Dr. Hopper, start with the idea that the gist is reliably stored in memory and is not distorted. Dr. And he said it at trial. So that opinion, that the so-called gist of a memory is reliably stored and can be recalled without distortion and is likely not to be distorted. That opinion, Dr. Hopper has not been shown to be qualified to offer that opinion. Any PhD in psychology, I assume, is qualified to read a study and report what it says. But that's not what happened here. Dr. Hopper is extrapolating from a couple of studies that he cited that don't stand for the idea of the gist being accurate. Okay? And he's apparently taking those couple of studies and extrapolating from them to an opinion about the gist of a memory that he has not been shown by his training, he has not been shown by his education to be qualified to opine about the accuracy of the gist of a memory. So he may be qualified. It may be that if there were a hearing, he could demonstrate his qualifications to offer that opinion. But the record, as it currently stands, doesn't show that. So certainly that opinion, that the gist of the memory is reliably stored and not distorted. Also, the comment about 85 to 95 percent accuracy. Is he qualified to make that judgment? Has he had extensive training with folks with recovered memories and assessed the accuracy of their memories so that he can offer that opinion? That's not been shown. The record doesn't contain any evidence that he's qualified on that point. So it's my argument on... I don't believe there was any literature for that point either. I don't believe there was any scientific support or citation for the 85 to 95. Correct. He did not cite anything for that statement. So I'm running out of time. I want to make sure I've answered your question. Did I do so? Yes. So just those two opinions, those are the two things that both as to what you're arguing he was not qualified to give and the two opinions that you assert are not sufficiently reliable to pass Stalbert. So related to the idea of the gist being reliably stored, I mean, there's also this opinion that it's possible to recover a memory in successive fragments over time. I mean, Dr. Strange said that's not possible. Dr. Hopper says that is possible. Again, does his training, does his education qualify him to make that statement? He didn't cite a basis for it. So he may be qualified to say that, but the record doesn't show that it is. But that's the core of his opinion. The core of his opinion in this case was the gist is reliably stored and memories can be recovered successively over time. And so those two, I would say, he has not been shown to be qualified to offer those. And I'm out of time and I apologize. If you want me to address the reliability piece on those, I can do that. I just, would you like me to do that or? We'll extend. Let's do another 10 minutes. OK, sure. Thank you. Let me ask, and of course, we'll give that to Mr. Fine as well. Let me ask, do we take account of not just what is in Dr. Hopper's report and exhibits, but also the additional secondary materials that were part of the briefing on the respective motions to exclude? Oh, the additional materials that are cited in the briefs is fair game for your honors to  But none of that supplemental material addressed the specific issues here of accuracy of recovered memories or this idea that you can start with a fuzzy image and slowly develop it over time into one that is a full memory that's accurate. None of the supplemental materials specifically address that point. Now, there's plenty of there's plenty of supplemental material that addresses the idea of repressed memory as a phenomenon, that it is possible to repress a memory. So and I'm not saying that. The generic opinion that memories can be repressed is not support is not scientifically valid. There are cases, including in Delaware, that have allowed that type of testimony. That's not my argument that the whether or not repressed memory as a as a concept, the phenomenon of memory repression, whether that can happen and whether it's scientifically valid is not the issue here. The issue here is the accuracy is the gist of a memory reliably stored and not distorted. And does that opinion and this is, I think, the key point. Does that opinion apply to a memory like those that Ms. Cohen describes? In other words, it's one thing to sort of, you know, you remember, you know, Ken Griffey, Jr. had a home run in 1995. I haven't thought about that in 30 years that, you know, that's sort of an ordinary phenomenon. These memories that Ms. Cohen describes start as a fuzzy image. She adds substance to them over time and comes to then believe that it's a memory of of abuse, childhood abuse. And the question is whether that type of memory, whether you can say that that type of memory, the gist of it is is reliably stored and accurate. And that's just there's no scientific foundation for that. It's not addressed in the supplemental materials that are in the reports. It's not even addressed in the D'Alembert study or the Williams study, which are the two studies that Dr. Hopper cited. In the D'Alembert study, D'Alembert did not specifically focus on that. The methodology in D'Alembert was just to take the memories as reported, split them up into units and then ask whether the units had support or not. It didn't distinguish between whether the units were peripheral, whether they were central, whether they didn't distinguish gist versus peripheral details. And in fact, it didn't it didn't it didn't look specifically at the qualitative character of the memories. For example, in the case of Stephanie, which is at addendum page fifty one in the D'Alembert study, the case of Stephanie is very much like the memories that Ms. Cohen reports. It starts as an image and over time, the individual adds substance to the memory and comes to understand it as a memory of being a victim of abuse. It turned out and it turned out that that memory was wrong in fundamental ways. And so and so that suggests that memories like these that are fuzzy and then become more substantial, they might well be inaccurate. But they suggest that that may be true in some cases. But the studies that were referenced in Dr. Hopper's report and included in the briefing in the district court also seem to suggest that there are instances of verified child sexual abuse where the victim doesn't recall for significant periods of time and then and then does have that memory. Well, how why isn't that sufficient to say that there is not a not a perfect basis, but there's at least a good basis for an expert to opine that that's that's possible? Well, what I would say is in that study, yes, that is one study that has been cited to suggest that so-called recovered memories are just as accurate as continuous non-recovered memories. That's one study. OK, and it's it's close to 30 years old. It hasn't been replicated as far as I know. It and it does not look specifically at the qualitative character of the memories involved. In other words, in many of those instances, the participants were just asked, well, was there a period of time when you didn't remember this? And the and the respondent says, yeah, there was a period of time when I didn't remember. Well, does that make it a recovered memory? It's certainly not described as being a memory like those that Ms. Cohen describes, where there's a fuzzy image that then becomes substantial over time. So the study didn't look specifically at those types of memories and evaluate whether those types of memories are reliable. So I think the study is not fine grained enough to get at the core point here, which is whether the memories that Ms. Cohen describes can be considered to be accurate. The study is not fine grained enough to get at that point, get at that issue. Mr. Bob, you asserted a little while ago that there has been no other court that's addressed the issue of accuracy. But of course, there are a number of courts that have addressed this in the context of tolling of the statute of limitations. Yes. Isn't it inherent in those determinations that they're in order to to toll that you're crediting the accuracy of those memories? Otherwise, there'd be no basis to say that there's even there's even an arguable point about someone being entitled to tolling because they didn't remember until a certain point in time when that memory came back. Yeah. So your tolling has nothing to do with whether you've sued the right person. So if you have a surgery and somebody leaves a sponge in your body and you find it five years later, the statute of limitations is going to be told. It doesn't follow that when you sue the doctor, you sue the right doctor. You could sue the wrong doctor. So all the tolling cases show is that there's judicial acceptance of the notion that memories can be repressed in a way that's inaccessible, that justifies extending the statute of limitations. It doesn't follow that when those memories are recovered, they're accurate and that you're suing the right person. I mean, it could be the person had abuse, but the perpetrator was somebody else. It doesn't the tolling cases don't establish the accuracy of the underlying memories. They just establish that courts have accepted that those memories are inaccessible enough to make it appropriate to extend the statute of limitations. So those are not an endorsement of accuracy. There is one case that I found, which is the unpublished trial court case which I mentioned in a 20HA letter, which addressed testimony like Dr. Hopper's. And I sent that letter to your honors just because I felt that I had to withdraw. In the brief, I had said I wasn't aware of any case. So I sent the letter to withdraw that statement because I became aware of one. But that's the only one I've been able to find that specifically addresses the accuracy question. What about in Clark v. Edison? I mean, although it's in the tolling context, the court takes up the issue as framed in terms of evaluating whether there's sufficiently reliable basis to offer an opinion as to accuracy. So in passing, the Clark v. Edison court mentions the Williams study because at the hearing that happened in that case, the question was asked of Dr. Hopper, what would you cite? Can you cite a study that talks about accuracy of these memories? And he cited Williams. So in Clark v. Edison, there's a reference to the Williams study. But in the analysis, the court doesn't get into that at all. The analysis portion of the opinion is solely about repression and tolling. And just one other point about what we didn't talk about Williams. That's the other study that Dr. Hopper cited here. In that case, the memories were contemporaneously with the events of abuse were contemporaneously reported at the time. So they weren't repressed. They were contemporaneously reported at the time. And Williams, the author of the study, specifically says the fact that they were contemporaneously reported may be part of the reason why the recall was accurate. And isn't that true here? At least if if Ms. Cohen's testimony is to be credited by a prior effect, that this was something she reported contemporaneously to her mother. And I understand the mother didn't testify. But there's there's testimony in the record that suggests a contemporaneous report. Well, there's one the one incident when the family moved to Oklahoma and and Ms. Cohen believes she was abused by the describes the family as Mexican. She did. It's not clear from the testimony whether that was contemporaneously reported or whether that was a couple of years later, as I read the testimony. She mentioned it to her mother a couple of years, maybe two, three years after the event that she believed occurred. So I don't know that it was contemporaneously reported. It is the one example that I'm aware of where it appears that she's describing it not really as a repressed memory. But it's very unclear what Ms. Cohen is saying there, because on the one hand, she's saying, yeah, I talked about it with my mother. On the other hand, she generally described all the memories as being repressed and inaccessible until she was far into adulthood. So there is that one example, Your Honor, that's true. And you could argue that that fits the the parameter of the Williams study. And maybe maybe that does suggest the accuracy or support the accuracy of that one incident. But we don't have findings on this, which I suppose you do not. And you mentioned fit. If you could just touch upon that for a moment here, because I know there were a couple of points where he testified about why his methodology fit here based on how memories like this are covered. But it didn't seem to fit the facts of the case. Well, exactly. I mean, Dr. Hopper does not address it in his testimony at trial. Dr. Hopper did not specifically address. Memories like these, and I apologize if I'm being repetitive, but for example, the memory of Ms. Cohen entering the movie theater and she has an image of of a suit jacket and a cuff, and and then she comes to interpret that as a memory of abuse. Well, that image of a suit jacket and a cuff doesn't have a clear gist to it. I mean, what's the gist of that? Now, later she comes to interpret it as a memory of abuse. And so I suppose she's imputing a gist to it at that point. But Dr. Hopper didn't. Does Dr. Hopper's general comments about the gist being reliably stored and not distorted? How does that apply? How does that fit a memory described in the way that Ms. Cohen described it? Just it's he did not specifically look at it. He did not specifically say my opinion generally about the gist being reliably stored applies to memories like those that Ms. Cohen describes. I hope that answers your question. Doesn't Velasquez tell us that in terms of helpfulness to the jury, in terms of fit, that the parody principle comes into play and that if we're if Dr. Strange was going to testify at Mr. Cohen's behest, that it's helpful to the jury to hear a countering opinion. Why doesn't that satisfy fit? Well, so the parody principle says so, for example, consider this is a roundabout way of answering your question. I'm sorry. So take, for example, eyewitness expert testimony, testimony that eyewitness identifications are not reliable. All right. There's not an automatic. You could the defendant in a criminal case can put expert testimony like that on the stand. The prosecution doesn't have an absolute right to then put an expert to say, you know, it is reliable. I mean, if if the prosecution can find an expert in the circumstances that satisfies Daubert, then they may be allowed to put that put that rebuttal testimony on. But there's no the parody principle does not stand for the idea that there's just an absolute right if somebody gets to call an expert to cast doubt on somebody's testimony, that that that that the other side just has a right to call an expert to to to to contradict that. That's not agreed as to qualifications and reliability. But I guess I'm asking, are you really arguing that as to fit that it's it's not sufficient here that it's a counter to testimony from an expert that's already been put on? That doesn't if the other elements were satisfied, wouldn't fit necessarily be satisfied, at least the way we've described it in Velasquez. So I think what I'm trying to say, and I'm sorry, your honor, I think what I'm trying to say is Dr. Hopper's rebuttal testimony does not squarely fit the case because whereas Dr. Strange said on the one hand that memories like those Ms. Cohen describes aren't memory doesn't work this way. You can't have an image of a suit jacket cuff and then come to understand it as a memory of abuse. That's not how memory works. Dr. Hopper just said, well, you know, look, the gist is reliably stored. It's not distorted and it's 85 to 95 percent accurate. But that testimony doesn't fit in the way that Dr. Strange's testimony fits. Dr. Strange is specifically addressing memories like those Ms. Cohen describes. Dr. Hopper is not. He's just offering the generic. And I appreciate the additional time and I hope I'm not trying your patience. I'm sorry. Well, we have given you additional time and we'll be hearing from you in rebuttal as well. OK, did I answer your question, your honor? For now. OK, thank you, Mr. Fine. May it please the court, my name is David Fine with my colleagues, Amy Groff and Matthew Goler. I represent the appellee, Alicia Cohen. On each of the points that the amicus is focused on, the record ably supports the determinations by the district judge. I think that there are two threshold points that I'd like to emphasize. One is that a number of things were not requested. They were functionally waived below. And it's important to bear in mind that Mr. Cohen was represented by counsel. His counsel did not act like a potted plant. They were very assertive, as you can see from the record. He may be pro se now, but he was not at that time. These were strategic determinations by his counsel. But how specific does that really need to be? I mean, there was an objection to reliability, right? Yes. You take issue with there not being particular objections to the criteria that inform reliability, like testing and methodology. But where is there the requirement that those specific points be raised as opposed to raising the issue of reliability, which then puts the onus on, if it weren't front and center for the district court before that point, that the district court has to take on and exercise its independent duty to assess Daubert factors? Why is it enough to make the more general objection, particularly to reliability? Your Honor, I'm not suggesting that there was a waiver with respect to specific parts of the Daubert analysis. They raised Daubert, and I do think that that's sufficient. What I'm getting at is, for example, counsel has now sort of shifted his argument a little bit, because in the briefs it was an argument about she didn't have a hearing. And now it's, well, she had a hearing, so we're not saying that. But she didn't make findings. And that was not something. There was no objection, for example, at the hearing, saying, Your Honor, you need to put this on the record. You need to tell us specifically with this, this, this, and this. So those are things that were not requested. And I understand, Your Honor, that there is some language in cases like Padilla that suggests that there is an independent duty. But at some point, the adversarial process has to be in place. And counsel does have an obligation. And to that point, Your Honor, I think you sort of answered the question when Mr. Fogdell was up, which is, this was a hearing to consider only Daubert. Judge Noriega heard argument from counsel about a number of motions. She had before her significant briefing that included reports, articles, all sorts of things. And she made determinations. It's at least implicit. Was it perfect? Would it have been better if she had said, I now go through these things. I find Dr. Hopper to be reliable. Perhaps it would have been. But in the trenches, it's not always perfect. But it can be enough. And in this case, it's implicit. When we look at it, we have case law where there was an extensive evidentiary hearing and there weren't findings, explicitly findings made. Fine. We have cases where there wasn't such a hearing, but there were findings. OK. Either of those gives the Court of Appeals something to review. What do we do here when we have neither an evidentiary hearing where the experts are their qualifications and the reliability of their opinions are really being tested for the court to make an assessment and something we then have a transcript that we could look at. And we also don't have any findings other than your experts testifying. And so your expert will also testify and just stay away from that particular application to this individual case. Right. I think the court has before it the same things Judge Noriega had before her. The experts' reports, the articles on which they relied, the argument of counsel, the cases, for example, the O'Day case, Judge McKee's decision, talked about when there's a need for a hearing. And I think that that bears on Your Honor's question. He said that there's a need for hearing when there are factual questions, credibility determinations. But Amicus has not identified any factual issues, nor has Mr. Cohen. The issues here are, is Dr. Hopper qualified? And we have his CV in the record. And we also, of course, have his testimony at trial. Of course, that wouldn't have been before Judge Noriega pretrial. But we have his CV. We have his report, which cites at length from various articles. And as well, we offered additional articles in response to the Daubert motion. So there was, in fact, a full record. And there's no fact that would have been divine at a hearing. So this court has before it the same thing that Judge Noriega would have, or in fact had. And so it has the ability to make the determination. Was that to say that if we were to look at this record and conclude that from what's there, the particular opinions that were offered, and we can talk about your response to that, but that there's not a good basis for that, that's at least set forth in this record, that we shouldn't be remanding. We should just be vacating the judgment. And I'm sorry, we shouldn't be remanding for a Daubert hearing post-trial, but rather vacating the judgment. And it would go back and start over. No, Your Honor, what I would submit to the court is that the court can look at the record that was before Judge Noriega and decide that it was sufficient to meet Daubert's standard, which, of course, and I think Your Honor mentioned this when Mr. Fogdell was at the lectern, is a threshold standard. It's not proving absolutely the truth of something. It's reliable enough that you can put it before a jury. I think you're minimizing the rigor of Daubert counsel. I mean, this is a gatekeeping function. The whole point of this is to make sure that expert testimony is sufficiently grounded and reliable and fits the facts of the case. I don't think it's a light standard. And I think what Judge Krause is sort of asking is, well, how are we going through all of that when we don't have a hearing and we don't have findings? How is it that we're replicating the function that the district court arguably didn't perform? Why isn't that something the district court needs to do? Let me answer in two parts, if I might, Judge Mady. First of all, I didn't mean to minimize the requirement. I do understand it. And I think that it was ably met here because this is not close to the edge. You know, Your Honor wrote a decision four years ago in the UGI case where somebody was talking about, you know, his anecdotal evidence of working in his father's appliance store. That was one where it was obviously not only close to the edge, but over the edge. This is not that. There are articles that were cited in Dr. Hopper's report and in our briefing that clearly supported every point that he made. And demonstrated the reliability, peer reviewed articles. Now, back to Judge Krause's question. Yes, Your Honors could certainly say that Judge Noriega did not make findings and you could remand the case for Judge Noriega to make findings. But now my colleague on the other side of the aisle is saying there's no need for hearing. There's only a need for findings. So if the court does that, that's what the court would be doing. I'm not sure what the benefit of that would be. But that seems to be what he's asking. Well, I think part of it, you made the point that Dr. Hopper has articles and he has pointed that they have been peer reviewed. That is true. But did he rely on those articles in this testimony? Because some of them seem to present different fact patterns that were issued here. And I think that's where you get into saying, well, can we really just look at a record like that and say, well, there were some peer reviewed articles and there's a CV. That's enough. Or do we have to say, hold on a moment here. Did he rely on any of those articles when he was testifying about the facts of this case? Judge, maybe there's never been a case from this court or from any other, to my knowledge, that says that an expert has to sit on the stand and say, and by the way, it's this article that I'm relying on for this. What Dr. Hopper did was in his report, he referred to the articles. They're footnoted throughout his report. And then when he took the stand, he testified with minor exceptions consistently with that report. So we know the derivation of each of his opinions from his report. And the report is in the record. Now, my colleague on the other side of the aisle says, well, there are articles that support various points, but that's just not so. There are, for example, there is a question about whether memories that are covered can then be accurate memories, just as accurate as memories that are continuously recalled. Well, that particular point is cited. In fact, it's an article that's attached to defendants' Daubert brief, but that actually doesn't help the defendant's point. It helps our point. It's at appendix page 379, an article called Piper. And it generally supports the point that contrary to what repression theory predicts, these studies demonstrate that adults recall central details from shocking and stressful experiences better than those from happy experiences and better than those from everyday mundane events. And it goes on to talk about recovered memories. So there is, in fact, peer reviewed article. There are, in fact, peer reviewed articles in the record and cited by Dr. Hopper in his report. Where is there evidence for the specific memory of 85 to 95 percent accuracy, which seems particularly important in a case like this, came up again in closing argument, and where there's not other significant corroboration, where the plaintiff's credibility is the central issue for the case? Well, the first thing is that that came up on the stand. It wasn't in his report, in Dr. Hopper's report, because he was responding to Dr. Strange and her testimony about certain studies. And he was simply saying that his recollection was that the study said that the core parts of memories that are continuously recalled, that are not the subject of implantation of false memories, there's something like an 85 to 95 percent recall rate. But you just added a number of qualifiers that are not part of the opinion that Dr. Hopper gave. I believe they are, Your Honor. Now, maybe I'm maybe I'm not perfectly correct in that, but I don't think Dr. Hopper was saying that recalled memories like Alicia Collins are 85 to 95 percent reliable. And the other point that I would make, Your Honor, because I do think that he was he was a lot more generic than that, was that there was no objection to that testimony to the extent that it went outside his report or to the extent that it wasn't reliable. Mr. Cohen was represented by counsel. There was no contemporaneous objection. And that goes back to the point that I made at the outset of the argument. Mr. Cohen was represented by counsel. This is not tabula rasa because there is now a very capable amicus counsel looking at the case. The bottom line here is that Judge Noriega had before her evidence that was sufficient, even assuming that Daubert sets a somewhat higher standard to demonstrate that Dr. Hopper was qualified, that Dr. Hopper's opinions had support in the literature so that they are reliable. And beyond that point, case after case from this court says that that's enough. The gatekeeping function is discharged and it's up to the other side through rigorous cross-examination and counter experts to challenge it, to put it before the jury. And that's exactly what happened here. That argument seems to seems to be that we can look at this record and determine that there was enough to satisfy Daubert. But what about us looking at this record in the first instance, addressing the gatekeeping function? Because I understand we could surmise that the district court was making the kinds of evaluations you're saying could be made from from this record. But given what the district court actually said on the record, isn't it also consistent with a determination that the parity principle is the beginning and end of the analysis? I don't think so. If you read the transcript of what Judge Noriega, at least on the Daubert hearing, so I'll use the language that the district court used on the docket, she was examining more than that. It wasn't just the parity principle. Now, I will grant you that, again, in a perfect world, she might have gone through the elements of Daubert and asked counsel about them. But then again, Mr. Cohen's counsel, who again was zealous in her representation, didn't raise those things. She was offered the opportunity to put on whatever case she wanted to make whatever argument she wanted. And she didn't do that. She simply argued certain things like Dr. Strange. And indeed, she wanted Dr. Strange to be able to testify that Ms. Cohen's memories were false. In fact, you go to the specific memories. And of course, that would have been inappropriate because that's for the jury. We never asked for Dr. Hopper to do that. And Judge Noriega very appropriately said, no, no, no expert is going to do that. You can speak to the mechanisms of memory, but you cannot go and talk about the specifics of Alicia Cohen's case. That's for the jury. But where is there any assessment of the reliability of the validity of the particular mechanisms that were being put forward by Dr. Hopper? It's not expressed on the record. And in view of that, where a record is equally consistent with a district court not engaging in that analysis as, you know, as engaging in it, is your argument we should just sort of presume that the district court went through, in her mind, the full gatekeeping function? Well, Your Honor, I don't know that I would say that in every case that should be that should be done, although Mitchell does stand for the proposition that there's no requirement to put specific findings on the record. So that is certainly part of this court's jurisprudence. The comment higher also says that there are appropriate proceedings need to be conducted where you have something that's particularly complex as an issue. And you hear as apparent where there has been a careful and thorough Daubert analysis, like the district court did in Clark v. Edison. This is a the issue of repressed memories is clearly controversial and a hotly disputed issue in psychology and psychiatry. How how can we just accept a record that is equally consistent with the district court, just accepting the reliability of the opinion put forward and not engaging in either an evidentiary hearing or explicit findings? Well, for example, Your Honor could could look at it and decide that it's essentially harmless error if it was error for Judge Norica not to make the findings on the record, because the court can look, as I've said before, at the record, it's fully before the court, briefing, articles, reports, all of those things. And the court can look and see that there was indeed evidence of reliability that was before Judge Norica. If I might, unless there are other questions from the panel, I'll turn just very briefly to one other point that really didn't come up when Mr. Fogdell was at the lectern, and that is the notion about the statute of limitations. Can I just go back to the particular opinion that was highlighted by Mr. Fogdell, and that is that Appendix 1652, research over and over again shows that people tend to remember the central details in the gist and they tend to be highly accurate, 85 to 95 percent accurate, if you just say, really recall what you remember. Where is there any good basis for that in the literature that is referenced in his report or even in the briefing in district court? Your Honor, the 85 to 95 percent, I can't point you to. The study after study, I can give you one example that's in the record. There's an article that I understand to be peer reviewed called Recovered Memory in the Dauberg Criteria. It's in the appendix at 725. And I was going to turn just very briefly to the statute of limitations issue. I think the bottom line is that if anything is remanded, there is no basis for this court to suddenly say that it's opened up again for revisiting. There were strategic determinations made by Mr. Cohen's counsel that they decided that, for instance, the Delaware statute on child sexual abuse did not pose any statute of limitations problem, and that was what counsel decided. And they did not ask for a jury charge. They expressly, on the record, said that there was no statute of limitations issue. So if there were to be any further proceedings in the district court, there would be no basis for this court to reach back and somehow reopen things. As I said at the opening, strategic decision decisions by counsel for a representative party don't suddenly get opened up because an amicus has come in and has a different view of them. I don't think his view is correct, by the way. I think I think what Judge Norica determined under the discovery rule was correct, but there would be no basis for revisiting those determinations. Would you say that's true even as to your ability, if there were a remand, to challenge the wholesale admissibility of Dr. Strange's testimony? That's that's a different question because we didn't. I'm not sure that that's the case, Your Honor. Why is that? Why is that? Because the landscape would have changed because of what the court did. And so the law of the case would be would be addressed differently. The statute of limitations would have nothing to do with any remand order from this court. The remand would be with respect to the Daubert issue and Dr. Hopper, which is a different issue. So the mandate rule would tell us that nothing about the issues that are already settled that were not up on appeal can come back up. But there would be a reopening potentially on the expert issue. And indeed, even amicus counsel says just that at the lectern and in his briefing. That there would be reopening of Dr. Strange as well, just so I'm following. Well, the issue, certainly. What's the issue? The issue is the reliability of testimony of repressed memories, whether those memories are accurate or false. I'm not sure I understand because none of this was that that wasn't raised below, so I don't know how that would suddenly be in play, but I see your time's up. It is. And with that, Your Honors, I'll simply ask that the court affirm the judgment below. And if it remands, that it remand only for purposes of Judge Ignorica to make findings, Daubert findings on the record. And if those findings support the admission, that that would be the end of the case. Thank you. Thank you. I apologize, I was just conferring with Mr. Fine. Mr. Fine mentioned in his argument a study that's in the record. I don't believe it was cited in Dr. Hufford's report, which is Piper's study. But I will look at that study again. If with your permission, I don't want to add to your burdens, but if I could address it in a 350 page letter, similar to a 28-J and Mr. Fine can respond, would that be acceptable? My memory of that is not, is it's generally talking about the recollection of traumatic memories, but not specifically about memories such as Ms. Cohen is reporting. But I'd like to address it in a letter if I could. Is that acceptable? That would be a few lesser pages, but I will permit that in a response. I appreciate that very much. So, Anna, you have sat through, Your Honors, a very long argument today. I will be very brief. The first argument Mr. Fine made was on waiver. Do you want me to address that? Do you want me to address why the issues are preserved? I don't think I need to, but I will. We'll leave it to you to raise any particular points you feel are necessary in response to Mr. Fine's argument. Well, I think what I said on that is sufficient. But just very quickly, Mr. Cohen argued specifically that repressed memory is not generally accepted. He argued that there's no evidence that recovered memories are accurate and that there's no empirical support. That, I think, fairly covers the Daubert reliability factors. I agree that he did not specifically raise qualifications in the motion, but he did raise it at trial, and I think that preserves it. On the issue of the need for a hearing, I want to be clear because I feel like even now I haven't been clear on this. There needs, there should be a Daubert hearing. That's not the error that occurred. The error that occurred is that there was no explicit Daubert analysis on the record and there was no findings made. The best way to make those findings is to have a hearing now. That's my argument, and I believe that's consistent with what I said in the brief. On the point about the 85 to 95 percent testimony at trial, it is true that Mr. Cohen's lawyers did not object to that testimony. If the issue that I was raising was a disclosure problem, that that was not contained in his report, I agree the disclosure issue would be waived. The Daubert issue is not waived. I mean, he's speaking specifically about the gist and how the gist is highly accurate when it's freely recalled, and Mr. Cohen squarely challenged the admissibility of that testimony, so the failure to object to the 85 to 95 percent is not a waiver. And this is one other way in which what Dr. Hopper said at trial does not fit this case. He's talking about memories being freely recalled.  Cohen's memories were not freely recalled. There's just no basis in the record to describe her memories as, quote, freely recalled, so that's another aspect in which Dr. Hopper's testimony just doesn't fit the memories that Ms. Revisited under law of the case doctrine. I don't believe that's correct. All of the positions, there was no pre-trial, if there had been a summary judgment motion filed where the court had made a ruling on summary judgment, I think that might well establish law of the case, which would survive a remand for a new trial. That didn't happen. Everything that happened, happened at trial. Mr. Cohen's memories, Mr. Cohen's lawyers took positions at trial that I believe were wrong. If there's a new trial, that would be, that first trial would be a nullity and all the positions that his lawyers took at the trial would be nullity as well. I don't think there's any authority for the, for the proposition that law of the case would bar Mr. Cohen from taking different issues, different positions now on statute of limitations. I'm out of time. Thank you, Your Honors, for being so generous with the time today. Thank you. Mr. Fogdell, Mr. Fein, thank you both. We've had excellent, very thorough, careful briefing in this case. And the court extends special thanks, Mr. Fogdell, for taking this on as appointed advocates. We appreciate advocacy, excellent advocacy. Thank you, Your Honors.